Looks like we're all ready to go. Good morning, Your Honors. May I please the Court? My name is Dennis McLaughlin. I'm with the Western Washington Law Group, and I represent the appellant, the Billing Associates Northwest, who is an assinee of the claims of various Washington landlords against a company that was their agent for billing and collection purposes that defalcated their money that was held in a segregated trust account. We're here today on a motion to dismiss that was granted without leave to amend any further based upon basically three affirmative defenses that the Court felt were clear on the face of the complaint, and we suggest that they're not. The first of those affirmative defenses is called the One Satisfaction Rule. The One Satisfaction Rule prevents you from, any plaintiff from getting a recovery more than what they're entitled to for one injury. Well, that's not the case here. Didn't get a full recovery. Let me have you help me on a different question, which is the case as against the manager defendants. I don't see enough allegations here to establish the exercise of personal jurisdiction, so I want to make sure that I give you an opportunity to address that, see if I'm missing anything. I've got Harper, the CFO, COO, COO. It doesn't seem like he started until after 2013. I don't see any allegations of any involvement by him with regard to the contracts at issue in this case. I've got Christ, the president, the one who signed the bankruptcy petition. Seems like he got involved in the later stages, and then I've got everybody else who owned and managed ADS, all being residents of Texas. That is correct. They are residents of Texas. So that's not enough to meet the minimum context. Well, we've alleged that... What am I missing? Okay. Well, we've alleged the alter ego theory, first of all, that they formed this company for the purpose of availing themselves to take over this Washington business. At first, ADS was a Delaware corporation that had a sales agent, Billing Associates, in Washington to sell the services of sub-metering and being a landlord's agent for collection and utility purposes. This group of people bought that ADS Delaware and formed a company called ADS LLC, which is a Texas corporation, specifically to take over the Washington business that targeted the Washington customers and purposely availed themselves of being able to do business in Washington under an LLC. However, they did it with an undercapitalized LLC. They didn't observe corporate formalities, and they did it solely for, as the allegations would say, solely for a shield of personal liability, but they directed and they... Every aspect of that corporation's business and what they did. The problem I have with that argument is I don't think it goes as far as you claim, just the general allegations that they're all involved. I mean, that's why I named Harper and Kreis in particular, because they didn't seem to get involved until even after the fact. So I think on the manager defendants, you've got to show that they individually have sufficient contacts with Washington. Well, again, I'd like to point out that the original contractual relationship was with a different entity, this Delaware LLC. It was the Texas LLC that bought the Delaware LLC, and all those people were involved in that decision to buy that LLC for the purposes of targeting the Washington customers and the Washington landlords. And they did it with an undercapitalized Texas LLC, which is separate and apart from the Washington LLC, but they did it with the intent to target those Washington customers. They were all involved at that time, and in fact, even after the bankruptcy, as it relates to Mr. Harper, he was the one who said, we want that book of business, and if you give us that book of business up there in Washington, we'll pay off all these landlords, but you're not going to have your customers anymore. So the goal was to go and get these Washington customers, and they caused damage to those Washington customers. They knew they caused damage to those Washington customers. They knew that that was the Washington customers' money that they were holding in a segregated account that they diverted for their own personal purposes. To determine your alter ego theory, do we apply Washington law or Texas law, and does it make a difference? It wouldn't make a difference in this case, because under either theory, with the allegations that are pled in the complaint, they would have the disregard of corporate entity, whether you want to call it alter ego. I think disregarding the corporate entity is probably a better term, but there are subtle differences. I would think if there's an intentional targeting case, though, of Washington residents, you would apply the Washington personal jurisdiction standards and the alter ego standards in Washington, because that's what they did. They purposely availed themselves, and they targeted Washington customers. They did it intentionally. They took their money, and they knew it was going to cause them damages in Washington. So in that case, they reached into Washington with an intent, and therefore, they should be held liable under Washington law for that alter ego theory, because they availed themselves of that purpose. I can move on to the other affirmative defenses. The next one was the release. The judge, I suppose, found, and appellees argue, that it's clear and unambiguous. I don't find it to be clear and unambiguous, and if I do, I find it to be clear and unambiguous in the different direction. The release says it settles all issues regarding property of the estate, and it's signed by Araya Holder, a person, Chapter 7 trustee. A Chapter 7 trustee is not a debtor in bankruptcy. They're two distinct entities. In fact, a Chapter 7 trustee is often adverse to the debtor in bankruptcy. Their fiduciary duty is owed to the creditors, and therefore, the creditors have a right to bring a breach of fiduciary duty claim against a trustee. So that's why there was a release as to the trustee. ADS is not even mentioned in that release, and it's all about property of the estate, both in footnote 5 and this last page of the release agreement. And then we have the last thing, is this statute of limitations defense. The Floyd versus Heffner duo, the 2006 unpublished case and the 2008 published case that modified the 2006 unpublished case, both of which were summary judgment cases, but well-reasoned either way, also shows that the trustee is not the same as the company because the plaintiffs were the company and the trustee, and the trustee was asserting claims that were owed to the company. So the statute of limitations in Texas, there's a day-for-day equitable tolling for purposes of when there's an automatic stay-in-place, which I'm just going to liken it in the crudest to a preliminary injunction. And then if you get a discharge, you get a permanent injunction. Well, they didn't get a discharge because they're a corporation. So there was a preliminary injunction that prohibited anyone from suing ADS at that time. The allegations are they discovered the defalcation and the breach of fiduciary duty during the bankruptcy, and they brought the claim within four years after the bankruptcy stay was expired. Well, the judge thought they made two different allegations, right, about that, and inconsistent allegations about when the discovery was made. Well, we always said that as to ADS, and I would disagree, but it's a matter of semantics, okay? Well, I, okay, so I'm not, you disagree with me about what the judge said? No, I'm not disagreeing with you. I'm disagreeing with what the judge said. Okay. I'm disagreeing with the finding, conclusion, whatever you want to go about it. It's de novo review anyways. I'm just asking you whether there are inconsistent allegations in the two different complaints. I think not. Okay. Explain why, please. Yes, because it was always that they discovered that ADS had committed the breach of fiduciary duty during the bankruptcy. After the bankruptcy ended, they found out that the defalcation occurred and benefited the corporate insiders, the non-ADS Applees, afterwards, that the money, they didn't know where the money was diverted to, where it went. They knew it went from the trust account to the operating account, and that it was the landlord's money. They didn't know that it was used to pay off the bills and other obligations of the non-ADS Applees, and therefore, they weren't inconsistent. The breach of the duty of loyalty that the non-ADS Applees engaged in was found out after the bankruptcy, after Mr. Collier... They had access to the database? They had access to the database. And that's when they discovered it? That's when they discovered that the money went from the trust account to the operating account. They didn't know the inside operations until after the settlement that the trustee had entered into with the former president of the company, Mr. Collier. Is it that the district court said that you had options, the lien associates had options during the bankruptcy, but didn't pursue them? Is your counter to that that you knew about the potential claims, but not the full scope of it? We knew that there was... We knew that there had been... When we got access to the Starnick system, which was in connection with the settlement agreement at the close of the bankruptcy, in fact, that was one of the last issues to close the bankruptcy, was that we had access to the Starnick system. We knew the money went from the segregated trust account into the operating account. So therefore, we knew that there was theft of these specifically identifiable monies that were used to benefit ADS. And that was not ADS's money. The money comes in that they collect on behalf of the landlords, the utility money. So you're saying that you didn't know, for example, until after you accessed the Starnick system that there were claims against the manager defendants? No, we didn't know that they... We didn't know that they were against the manager defendants until after the bankruptcy closed.  Hang on, forgive me for interrupting, but that's the problem. So the district court said, reasoned, that billing associates originally pled that it learned of facts necessary to bring claims against ADS, against ADS, as you said, right? During the bankruptcy, quote, while the trustee was pursuing claims against some of ADS managers. Right, like Mr. Collier and Circle K. Then in the second amended complaint, plaintiff states, quote, after the ADS, I think that's supposed to be bankruptcy, was initially closed in December 2016, billing associates received further information for the first time that supports a claim against ADS. My understanding is what you're saying is that after the bankruptcy closed, you got access to the Starnick system, if that's how you pronounce that, Starnick, whatever, to that system, that database, and that's when you learned that you think there were wrongs committed by the individual managers. Is that right? No. We got access to the Starnick system during the bankruptcy. And that showed money just going from the trust account to the operating account of ADS. Yes, but, but, okay. Okay. And then after that, we learned that the money that went into the operating account went for the benefit of the non-ADS Applees. So that's when we became aware that they had breached. That knowledge came to you after the bankruptcy. That's why they're not, it's confusing because... It's the initial closure, right? As of the time the bankruptcy was initially closed, what did you know? We knew that there was money that went to ADS. Okay. All right. And then afterwards, we learned that ADS used that money to pay off obligations of the individual Applees, the non-ADS Applees. So therefore, we learned that afterwards, because after the trustee had settled all the claims that, pre-petition claims that ADS had against Mr. Collier, Mr. Collier produced a declaration. And that's where we obtained that information sufficient to allege a claim against the non-ADS Applees. So confusing, yes. Perhaps not as artful as I would have liked it to be in hindsight. But that's why the allegations are not inconsistent, which is, I believe, what you were asking me, Judge Christie. Well, and then you have the... It is, because I think the district court was bothered by that, and he's pretty clear about that. And then he's got this problem of you being... Because your explanation is pretty clear, right? But he had a motion to dismiss and no opposition. That's correct. It was filed 19 hours late. Okay. And so what do we do about that? Well, the court undertook an independent duty, which is its right to do, to look at this, and relied pretty much on the First Amendment complaint, and said, well, you didn't cure the deficiencies that I saw in the First Amendment complaint, and we're going to the merits of those issues. And if the court undertakes an independent duty to look at the allegations of the complaint, then it has to take them as being true, and see even if it's a plausible claim. And we believe there is a plausible claim there, and that the court erred by relying on three affirmative defenses that had yet to be pled as being dispositive in this case, because plaintiffs aren't typically supposed to plead around affirmative defenses, at least I agree that the law is a little bit unclear on that, but I think we're getting back to that. If you look at the unpublished plough majority decision. So under those circumstances, I believe that relying on the one satisfaction rule, relying on the statute of limitations rule, and relying on the release rule, all of which are not dispositive on the face of the complaint, then I believe at this case, then the motion to dismiss should have been denied, as it should have been with the First Amendment complaint. But the court relied on the rulings in the prior First Amendment, the order on the First Amendment complaint, when they issued the order on the Second Amendment complaint. That's why we allege that that was an error as well, because of the incorporation by reference. And if the court doesn't have any more questions of me on the procedural niceties and a lot of pages, when I looked at the synopsis, I realized that we were probably going to get more into the merits of these claims than we are as to these procedural waiver issues and all that. But if there's no other questions, I'll just save the rest of my time for rebuttal. That's fine. Thank you so much. You bet.  One second, Your Honors. Okay. May it please the court, Rory Cosgrove, along with my partner, Mark Rosenkranz, on the briefing from the Connie Badley Spellman firm in Seattle. We're here on behalf of Appalese Addison Data Services, LLC, and its members. Billing associates had three opportunities to plead a plausible claim against Appalese. Three times it failed. The district court properly dismissed billing associates' second amended complaint under Rule 12b-6, and this court should affirm that dismissal order. I want to jump right into Judge Nguyen's question about the claims against the ADS members, and I want to focus on that first. And I think it's important to distinguish between what type of claims billing associates is alleging against the ADS members. We see from its opening brief in the 20-plus issues that it identified for this court to review that it purports to raise a direct breach of fiduciary duty claim against the ADS members and a derivative breach of fiduciary duty claim against the members. I want to jump right into that issue. Number one, a direct breach of fiduciary duty claim against the ADS members is not recognized in Texas. And that's the first issue I want to address. And to address that issue, we turn to Matthews v. Milkshake, LLC, as a 2014 decision from the bankruptcy court in the Western District of Texas. Following Delaware law, the leading jurisdiction for corporate law issues, that court recognizes that Texas does not recognize a direct breach of fiduciary duty claim asserted by creditors against a corporation's members. And that case is — that principle emanating from that case is followed by numerous other jurisdictions. Another case, Torch Liquidating Trust, XREL Bridge Associates, LLC, v. Stocksville. This is a Fifth Circuit decision in 2019, 561 F3 — F3rd 377 at 386, quote, individual creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors. And there are more. Kay v. Lone Star Fund, that's a bankruptcy decision from the Northern District of Texas, 2011, 453, Bankruptcy Reporter 645. Whether the corporation is insolvent or not, creditors never may assert direct claims against directors or officers for breach of fiduciary duty. And that's citing a leading case from the Supreme Court of Delaware, GWALA. The point being that it comes as no surprise in Billing Associates' opening brief that it doesn't cite any law, no authority whatsoever for its purported direct breach of fiduciary  I hate to interrupt your flow, Counsel, but the clock runs very fast. And I want to move you to the claim against ADS, and specifically footnote 5 of the settlement agreement, because that — it's a specific carve-out, and it carves out any claims against a bankruptcy estate related to access to the estate's database with Starnick Systems, Inc. And it says these claims are specifically exempted from the release. So why doesn't Billing Associates get the benefit of that? Well, to answer your question, Your Honor, I think we first have to start with the basics of what — how this settlement agreement arose, and then I will directly answer that question. So in a Chapter 7 bankruptcy, when a debtor files a petition, two things happen. An estate is created, transferring all the debtor's property to the estate, and an automatic stay is entered. All of the debtor's property interests go into the bankruptcy estate. Creditors, whether unsecured or secured, must file proof of claims in the bankruptcy proceeding. And then the trustee who's charged with administering the estate analyzes the claims and either allows them or disallows them. And in this case, the trustee for the ADS bankruptcy estate and two creditors, one of which is Billing Associates, signed this release and settlement agreement. It did two things, and then I'm going to address your question, Judge Wynn. Please do. Yeah. So it allowed a claim — it liquidated an unsecured claim for $653,000, and it released all claims that Billing Associates may have against the bankruptcy estate. And then it had a carve-out. And this is to answer your question. The one exception to this very broad mutual release is that this settlement will have no impact on any existing agreement — any existing agreement between Billing Associates and the trustee concerning post-petition access to the database and any claims against the estate related to such. Such is modifying any existing agreement between the trustee and Billing Associates concerning access to the Starnik system. And thus, this release exempts that claim. There's no allegation here that Billing Associates was denied access to the Starnik system. And so this carve-out does not save the claim that Billing Associates is alleging against — Well, that's one possible reading. You're reading it in the narrowest way possible. And even if we accept that that is an acceptable reading, there's another reading, right? So to the extent there's any ambiguity, why doesn't Billing Associates get the benefit of that? Well, I think first — to answer that question, first, I think this is plain and unambiguous. It's not. Well — It's not. It can be read a couple of ways. Just accept that as a hypothetical, if you will. So if I understand the Court's questions — Let me rephrase my question because maybe I didn't make it specific enough. I'm reading this provision, and it releases — I'm reading the second phrase. Any claims against a bankruptcy estate related to such — right? And you're saying, well, such talks about the agreement. It modifies the agreement. I think that another fair reading would be related to such, meaning related to post-petition access to the state's database with Starnik systems. So to the extent that this release or this carve-out is acceptable to two different readings, I think the law dictates that Billing Associates get the benefit of that ambiguity. Well, I think how I would answer that question is we have to interpret this provision in the context of the entire settlement agreement. And if we're analyzing the plain meaning of this agreement, when it says that this agreement will have no impact — let's read this together — on any existing agreement between the parties concerning — so the agreement — any agreement concerning post-petition access. So in other words, if the trustee — if an agreement existed between the trustee and Billing Associates concerning access to the Starnik database, that this agreement would not prohibit Billing Associates from suing or other — from pursuing relief in the bankruptcy estate concerning that access. But here, there's no allegation whatsoever in any of the three iterations of Billing Associates' complaints that it was either denied access to the agreement or that there — sorry, denied access to the Starnik system or that there was an agreement that the trustee purportedly breached that thus prevented Billing Associates from uncovering any information it wanted to receive from the Starnik system. And that's relevant if you read the footnote the way you're reading it. Right. But Judge Wins invited you to look at it the other way and suggested that it could be read a different way. And why wouldn't they get the benefit of that — you know, the drafting ambiguity is what we're waiting for you to answer. Right. Well, I think the best way for me to answer that is this — the release and settlement agreement is merely one independent ground to support the district court's dismissal of Billing Associates' claim against ADS. And so if I can transition that — I think it's — The answer that you're trying to give to my question is that my reading is not supported by the text. Absolutely. And — So let's talk about that. Okay. What evidence was there of a separate agreement about accessing the Starnik system? There's — as far as I — as far as I know, in reading all three iterations of the complaints, there's no allegation whatsoever about some sort of agreement between Billing Associates and the trustee. I mean, certainly Billing — Is that problematic for you? If there had been such an agreement, then it seems to me easier to read the footnote the way you're suggesting it should be read, where the footnote, when it says such a — it's referring to such agreement. But what you're telling us is there isn't an alleged agreement about accessing the system. Or Billing Associates merely didn't allege. The agreement could possibly exist. And I'm just saying that the point is that the absence of reference to such agreement, it doesn't help you for purposes of construing that footnote the way you want us to construe it. I think that if the court concludes that there is ambiguity in this agreement, I think there's — under the case law, the court would be — it would be able to draw the conclusion that the agreement could be read the other way. But again, what I'm positing is that this agreement is plain and unambiguous and should be enforced according to its plain terms, just as much as the district court acknowledged. Now, I'd like to turn — But it doesn't seem plain to me, so let's move on to the third part of the argument. Okay. That's fair. I did want to address — to go back to — and then I'll — eventually, I've got 10 minutes left. I want to address the claims against the ADS members, because there was a colloquy earlier about the relevance or irrelevance of Billing Associates' knowledge about its claims against the ADS members and whether — when was that knowledge learned? Did it come — during the bankruptcy, did it come after? It's irrelevant, because Billing Associates has no direct claim against the ADS members. Again, it — Well, the judge didn't think it was irrelevant. He went to the fallback argument about whether there was a claim. But his order very clearly finds relevance in the two different ways the complaint makes this allegation about when the discovery was made. Right. And again, this Court can affirm on any basis supported by the record. And so what I will say on this issue about the claims asserted against the members, number one, they've — in their issues presented, they've purported to assert two claims, derivative and direct, of breach of fiduciary duty. We know that direct breach is not recognized under Texas law. And on the derivative side, they didn't make the argument in the opening brief. That argument's waived. And so when we come to the district court's rationale, the district court got it right because even if the court were able to revive an argument that they waived by not addressing it in their opening brief, it failed as a matter of law because of the inconsistent allegations that Billing Associates alleged in its two different complaints. And I want to address the Court's question earlier between counsel on the inconsistency. We look at the First Amendment complaint, ER 4908, paragraph 34. When the trustee began pursuing claims against some of the ADS managers, Billing Associates and the landlords, by accessing the ADS's computer software, known as the StarNIC system, learned for the first time that ADS transferred the tenant utility payments before ADS filed for bankruptcy. That's what it alleged. And then later, there's a direct — Counsel, counsel, we can hear you just fine. If you slow down just a little bit, it'll be easier to understand your argument. Absolutely. Later, if you look at the Second Amendment complaint, here's the inconsistency that the district court judge pointed out. Yes. ER 299, paragraph 86. This allegation directly conflicts with paragraph 34, ER 498, in the First Amendment complaint. And in the Second Amendment complaint, Billing Associates alleges, after the ADS bankruptcy closed in December 2016, Billing Associates received further information for the first time that revealed ADS transferred the tenant payments directly to the ADS members for their benefit. And it also alleged that it learned for the first time that the ADS members knew that the tenant payments were the landlord's property. This is the inconsistency that the district court judge pointed out and, therefore, applied judicial estoppel to prevent them from raising an inconsistency directly contradicted by their prior pleadings. And again, the derivative claims against the ADS members, the derivative claim for breach of fiduciary duty that they are raising on behalf of the debtor corporation against the creditors, they didn't make any argument in their opening brief. That claim is waived. And it's the same for the derivative trust fund doctrine claim that they raised. They admit in their opening brief that that claim is derivative. And the reason that Billing Associates' knowledge is not important, because it's a derivative claim. They're bringing it on behalf of, essentially, the trustee. And so the trustee's knowledge and the debtor's knowledge is imputed to Billing Associates. And so we know that the trustee was charged with the duty of administering the estate, analyzing the claims filed, and also analyzing the debtor's financial condition and whether the corporate managers were mismanaging the corporation, committing corporate waste, etc. There's no allegation that the trustee didn't do his job. And frankly, it's presumed that the trustee is fully and capably administering the estate. And so the trustee, we know from the first amended complaint, knew about these possible claims. It investigated them. One thing that is consistent in all three iterations of this complaint is Billing Associates admits that the trustee has the sole and exclusive authority to pursue these derivative claims against corporate managers. It investigated those claims. It pursued some of them, but it declined to pursue others. During the bankruptcy proceeding, it satisfied its duty of administering the estate. And once— Nobody's arguing otherwise, right? The estate was—the bankruptcy proceeding was reopened. They wanted to bid on—there was competing bids on the remaining claims. There's no problem with that, is there? Well, there's not necessarily a problem, but the problem for Billing Associates is that by the time they, you know, bought the abandoned claims in 2021— There were competing bids for those abandoned claims, uh-huh. They purchased claims and paid money to the bankruptcy estate that could then be used to pay for administrative costs and any remaining creditors that had claims. But by the time they bought that claim, that claim had already expired a long time ago. The trustee declined to pursue it. And one thing I want to say here is it's not unjust for this result. And we know from—I believe it's at—let's see here. It's at ER 382. This is the order granting the compromise, the motion to approve the compromise. Can you help me out? Which volume, please? The first volume, 382. Okay. And on foot—there's only one footnote. The footnote on 382, the trust—it says, the trustee does not make any representations or warranties of any kind or nature as to the extent or validity of the bankruptcy estate's interest in any claims, whether they exist or not, and whether they are viable. And so the point being here is that Billing Associates was on notice that it was purchasing these claims that remained dormant in the bankruptcy estate, but the trustee was not guaranteeing that these claims still were viable. And the point being is that by the time Billing Associates got these derivative claims in 2021, the statute of limitations had already expired. They were worthless claims. So you're on ER 382 in volume 3. There's a footnote, the trustee does not make any representations. That's where you want us to be?  Okay. Yes, Your Honor. All right. And— I'm sorry. Yeah, I printed these out just individually. I just—no problem. I just want to make sure when we ever— Right. We have to listen to this. Our clerks will find the record site. That's all. And one thing I want to say about this is this isn't an unjust result. I mean, again, going back to basics, the trustee is charged with administering the estate. Billing—the trustee hired Billing Associates' attorney to represent both the trustee and Billing Associates. And so, again, for these derivative claims, all knowledge from the trustee is imputed to Billing Associates because it's acting on behalf of the estate, right? And so—but as the district court acknowledged, Billing Associates had options. There's a case in the Fifth Circuit. It's called Gibraltar Savings, L.D. Brinkman Courts. It's at 860 F. 2nd, 1275. And there were prior decisions from that circuit that essentially hold that for claims against corporate managers or members, those belong to the trustee. And so only—sorry, that those belong to the bankruptcy estate. So, therefore, only the trustee has the authority to pursue those claims for the benefit of all the creditors. But this case that came a year after SI acquisition, which is cited in this case, says that, well, what about in those circumstances where the trustee may not be pursuing claims that a creditor may otherwise want to pursue? Well, in that case, the creditor in Billing Associates' shoes obtained a leave from the trustee to derivatively assert the claim against the managers. And that's what they could have done here. And let's keep in mind— But were they required to do that? No, of course not. But the point being that this is an unjust result, that the statute of limitations expires, and therefore their claims are stale and can't be pursued. They had options. And, by the way, the automatic stay didn't prevent Billing Associates— well, they were derivative claims that— but the point is that they could have obtained a leave from the trustee to ask the trustee, trustee, we've presented the information to you. You've investigated this. We want you to pursue it. They didn't ask the bankruptcy court to pursue these— Right. And they didn't have to do that. But the district court thought that they were free to pursue them themselves. Right. Well, of course, they were free to pursue them themselves once they were abandoned by the trustee. Right. Right. Which happened way too late, after the statute of limitations had expired. That sort of begs the question about whether it was stayed or not. But I appreciate your point. I understand your point. Okay. And I do want to get back to— if the Court has no further questions on the issues about the claims asserted against the ADS members, I do want to briefly turn to the issues for the— for ADS. I mean, I've got a minute left, so I'll just focus on the main argument that the district court adopted and that we would advance this Court to adopt as well on the statute of limitations. One thing is consistent in all three iterations of the complaint, that billing associates knew as of June 20, 2014, that ADS breached the agreement. That's their allegation, that we breached the agreement. What was the primary obligation under this agreement? Well, the primary obligation was that bill— utility payments sent to it, it would hold those payments in its trust account, in its operating account, and then eventually remit those payments back to the landlords. So the— that was the primary obligation. Now, billing associates didn't allege how the agreement was breached or why, but the point being is that the statute of limitations began running before ADS filed for Chapter 7 bankruptcy. And so we know that a cause of action accrues when a defendant— Are you going to tell us that part of the statute of limitations has already expired before it was told? Is that your point? No, I guess I've got 20 seconds, but the point is— That's what I'm trying to help. I agree with the premise that under Texas common law, which is incorporated into Section 108 of the Bankruptcy Code, the extension of time, that they get the benefit of a one-for-one tolling. And so the statute of limitations was told from July 18, 2014, until December 27. What's the July 14 date? Is that the date of the filing? Sorry, July 18. I'm sorry. July 18 is when the bankruptcy petition was filed.  And until the— So under Texas common law, under their tolling doctrines, they get— the day that the bankruptcy petition is filed, it goes all the way up to the time the automatic stay is terminated. And so then the statute begins running the following day. But doesn't it resume running? Right. It resumes running. So my point being, though, is they filed their complaint in federal court in Seattle exactly four years to the day. The problem for billing associates is that the claim had already began running. Right, which is why the answer to my first question should have been yes. It had already started running. That's my conclusion, and I'll leave with that. My answer to your question, Jess Morgan, is yes. Jess Christensen is yes. And if I could just summarize my request for relief, because I'm out of time. Yes. We're asking this court to affirm the district court's dismissal of billing associates' claims against all FLEs under Rule 12. Thank you for the court's time. Thank you. Counsel, I do have this question about the statute having already run and the tolling period only being coextensive with the bankruptcy stay. The discovery rule. Fiduciary duty claims, especially— Well, but, okay, but as to, I think, opposing counsel's argument, and I think I found this in the record, is that there's an allegation from your team that as to ADS, as to the corporate defendant, there was knowledge of the breach earlier, before the bankruptcy was filed. Is that wrong? That's, a breach of fiduciary duty, that would be incorrect. Any breach? Breach of, he said breach of the contract. Yeah, well, no, we terminated the contract because it wasn't going right. I just want to know the answer to the question. The answer is no. Why? Why? Because what we're talking about, first of all, is breach of fiduciary duty. Well, okay. Okay, so that's the claim. And the breach of fiduciary duty begins to run upon discovery of the breach by the fiduciary. And we're talking about, as to the corporate defendant, you're right, your position is that the statute of limitations had not already started to run. That's correct. So it's only coextensive with the bankruptcy stay, which would be consistent with the allegation in your First Amendment complaint. That's correct. All right. Okay, that's absolutely correct. And that's one of the first points I was going to bring up. The second point I was going to bring up is we've got to make sure that we understand the difference between abandoning an asset and purchasing an asset, because they were used interchangeably by opposing counsel. If billing associates would have bought the claim, that may be a different story, but they didn't. They bought, they paid to have the trustee abandon it back to the debtor, ADS. Why does that matter for purposes of your argument? Well, because we could not assert the derivative claim on behalf of ADS against the corporate defendants until the claim got back to ADS. And that's the big distinction. And that's why, and then we had to prove that they were insolvent and that they weren't doing business, and then we could derivatively assert that claim. We didn't buy the claim. We paid for it to get abandoned back to ADS. So that's a very important distinction, because until ADS got the claim, we couldn't derivatively assert it. We were speaking in shorthand. I don't think it's because we misunderstand the record, but thank you for the clarification. Okay, thank you. And I'd like to go back to the release carve-out, because such, and you'll notice even in their briefing that they added the term agreement in brackets in their answering brief, but that isn't the only plausible reading. You're going to get, let's assume there was this agreement, okay? Wait, wait, which agreement? This agreement to access the Starnik system. Was there, is there any indication of that? There's no, there's no allegation of that, but let's, but it says that, but there was going to be given access to the Starnik system. Now, if you said there wasn't any allegation that there was an agreement to give them access to the Starnik system. I'm saying, on footnote five, they were given access to the Starnik system, and they said anything related to access to the Starnik system is exempt. Why? Because you don't know what's in the Starnik system until you look at it, so you're not going to release those claims that arise from the access that you are given. That's a plausible reading, because why would you release claims that are within this database that you haven't seen, you are going to exempt it from that database. So that's a plausible and reasonable reading, and I think that Judge Wynn had it correct. Other than that, I, I, I want to point out once again, once again, on paragraph 34 of the first amended complaint, that was only as to the corporate defendant ADS. It's clear, it says, we discovered the money went to ADS. Paragraph 86 of the second amended complaint says, after the bankruptcy closed, we learned that it was paid to the non-ADS managers. And that's clearly the difference that I was trying to say before. Any other questions? I'll yield my 26 seconds. Anything further? Nothing further, thank you. I want to thank you for your attention and thorough reading of the record and your clerks. You guys did an amazing job. Thank you. You made our clerks day. Thank you all so very much for your advocacy. We'll take this case under advisement and we'll stand in recess for today.
judges: CHRISTEN, NGUYEN, Ezra